# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MICHAEL VANDIVERE and KATHRYN SNOW VANDIVERE, husband and wife and their marital community; and KATHRYN SNOW VANDIVERE as the legal guardian of W.V., a minor,

        Respondents,

v.

VERTICAL WORLD, INC., a Washington State Corporation,

        Respondent,

v.

C3 MANUFACTURING, LLC, a Colorado Company; and SINARS SLOWIKOWSKI TOMASKA, LLP,

        Appellants.

No. 85568-9-I
(Consolidated with 85769-0-I)

DIVISION ONE

UNPUBLISHED OPINION

FELDMAN, J. — C3 Manufacturing, LLC (C3) and its former trial counsel, Sinars Slowikowski Tomaska LLP (Sinars), appeal the imposition of discovery sanctions against them jointly and severally, payable to Michael Vandivere and his family (Plaintiffs) and C3's codefendant, Vertical World. C3 and Sinars were sanctioned for failing to timely supplement discovery responses with information about the rescission of a $4M insurance policy and for failing to disclose 38 visits

an attorney from Sinars made to Vertical World climbing gyms during the pendency of the litigation. The superior court awarded Plaintiffs sanctions totaling $287,527.17, and awarded Vertical World sanctions totaling $212,630.53. C3 and Sinars challenge the awards on multiple grounds. Sinars challenges the trial court's ruling that three of its attorneys be referred to the Washington State Bar Association (WSBA) for possible professional ethics violations. Finding no error, we affirm.

I

Michael Vandivere was injured while rock climbing at Vertical World, an indoor climbing gym in Seattle. At the time he was injured, Vandivere was using an auto-belay device manufactured by C3, which allegedly failed to properly prevent and control his fall. He sued Vertical World for negligence and subsequently asserted claims against C3 under the Washington Product Liability Act (ch. 7.72 RCW) and Washington Consumer Protection Act (ch. 19.86 RCW). One of C3's affirmative defenses was that Plaintiffs' damages, if any, were caused by the acts or omissions of Vertical World, over which C3 had no control.

This appeal concerns sanctions awarded based on two sets of discovery requests and responses. First, C3 and Sinars were served with discovery requests related to C3's insurance coverage, including requests for disclosure of any excess or "umbrella" policies. As discussed in detail below, C3 responded indicating it had a $4M excess insurance policy in effect at the time of Vandivere's injury. Second, C3 was asked to disclose all dates and locations in which C3's attorneys met with any of Vertical World's employees. C3 responded in August 2022, "In

- 2 -

April of 2022, representatives from C3, Vertical World, and Plaintiffs all met at Vertical World to test two Perfect Descent Auto Belays. C3 does not recall meeting with Vertical World on any other occasion."

Approximately one month before trial in 2023, new information came to light as to both sets of discovery requests. First, Vertical World discovered that one of C3's attorneys from Sinars, Chris Furman, had visited Vertical World once in 2022 and then visited its gyms approximately 37 more times in 2023, all after joining C3's litigation defense team. Vertical World expressed surprise at the new information and indicated it intended to call Furman as a witness at trial as a result of his interactions with Vertical World employees at the gym. Shortly thereafter, Sinars withdrew from representing C3. Second, three days after C3's new counsel filed their notice of appearance, they supplemented C3's discovery responses with information about its insurance coverage. The supplemented responses indicated C3's excess insurance carrier, Houston Casualty Company (HCC), had rescinded the $4M excess insurance policy that had been in effect at the time of Vandivere's injury. Neither C3 nor Sinars had previously disclosed that information.

Plaintiffs filed a motion for sanctions on May 24, 2023, shortly after learning of Furman's visits to Vertical World and the rescinded insurance policy. They argued the failure to disclose Furman's visits to Vertical World and failure to supplement the answers related to insurance coverage warranted an award of discovery sanctions under CR 26(e) (supplementation of responses), 26(g) (signing of discovery responses), and 37(d) (failure to serve answers to

interrogatories or respond to request for production).[1] Vertical World also requested sanctions, arguing that it would have settled months earlier instead of litigating and preparing for trial had it known its codefendant no longer had an effective excess insurance policy. Consistent with that assertion, Plaintiffs and Vertical World promptly settled their dispute on June 5, 2023.

The trial court conducted a hearing on June 14, 2023. The court granted Plaintiffs' motion for sanctions. It found Furman visited Vertical World gyms approximately 38 times, Sinars failed to disclose this information in response to Plaintiffs' interrogatories, and Plaintiffs were thereby deprived of their ability to further investigate the nature and extent of Furman's conduct. The court further found that C3 and Sinars knew of the rescission of the insurance policy in January 2023 and did not disclose it. The court awarded Plaintiffs sanctions based on the attorney fees and expenses they incurred from the date that HCC rescinded the policy to the date of the hearing "to address the needless and avoidable costs and fees incurred by Plaintiffs."

Also at the hearing, the court requested declarations and supporting materials from Plaintiffs to determine the amount of the award and further briefing from Vertical World regarding its asserted entitlement to a corresponding award of sanctions. Lastly, the court expressed its "view" that Furman's conduct violated RPC 4.2 and 4.3 and directed Plaintiffs' and Vertical World's counsel to refer the matter to WSBA. The court added that Sinars' supervising attorneys, Duncan

---

[1] Plaintiffs also requested sanctions under CR 37(b) (failure to comply with discovery order), but did not identify an applicable discovery order.

Lemmon and Jim Hicks, should be included in the referral because they had knowledge of Furman's conduct and failed to disclose it.

The court entered a written order granting in part Plaintiffs' Motion for Sanctions on June 22, 2023. It incorporated its oral ruling of June 14. After reviewing the fee declarations of Plaintiffs' counsel, the court awarded Plaintiffs $287,527.17 in fees and costs against C3 and Sinars, jointly and severally. The same day, the court granted Vertical World's motion for recovery of attorneys' fees and costs. The court also ruled that C3 and Sinars were jointly and severally responsible for the sanctions award. The court then ordered Vertical World to submit a fee declaration with supporting documents. After receiving Vertical World's fee submission, the trial court entered an order granting Vertical World's motion for attorneys' fees and costs in the amount of $212,630.53.

Sinars and C3 appeal.

## II

Sinars and C3 argue the trial court erred in ruling that Plaintiffs and Vertical World were entitled to discovery sanctions and abused its discretion in determining the amount of those awards. C3 also argues the court erred in concluding C3 and its counsel are jointly and severally responsible for the awards. We disagree.

## A

CR 26 and CR 37 govern the propriety of discovery sanctions here. CR 26(e)(2)(B) provided as follows: "A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which the party knows that the response though correct when made is no longer true and the

circumstances are such that a failure to amend the response is in substance a knowing concealment."[2]  Under CR 26(g), attorneys responding to requests must certify that they have read the response and after reasonable inquiry believe it is consistent with the discovery rules.  CR 26(g) also provides:

> If a certification is made in violation of the rule, the court, upon motion or its own initiative, *shall* impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, *or both*, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.

(Emphasis added).  CR 37(d), in turn, authorizes a court to impose sanctions "as are just" and provides a nonexhaustive list of corrective actions.[3]  Critical here, CR 37(d) further states that instead of or in addition to taking one of the actions specifically authorized by the rule, "the court *shall* require the party failing to act or the attorney advising the party *or both* to pay the reasonable expenses, including attorney fees, *caused by the failure*."  (Emphasis added.)  The word "shall," when used in a civil rule, is generally construed to "impose a mandatory requirement." *Walker v. Orkin, LLC*, 10 Wn. App. 2d 565, 572, 448 P.3d 815 (2019).

We give "wide latitude" to trial courts in fashioning an appropriate sanction for discovery violations.  *Barton v. Dep't of Transp.*, 178 Wn.2d 193, 214-15, 308

---

[2] CR 26(e)(2)(b) was amended effective October 1, 2024.  Order No. 25700-A-1592 (Wash. Sup. Ct. Sept. 5, 2024), https://www.courts.wa.gov/court_rule_related_orders/orders/25700-A-1592.pdf. This opinion quotes and discusses the rule as it existed at all relevant times herein.

[3] These actions include:  a witness may be ordered to appear for deposition (CR 37(d)(1)); and the party may be ordered to serve answers to interrogatories or written responses to requests for production or inspection of documents (CR 37(d)(2)-(3).  CR 37(d) also authorizes the sanctions provided in CR 37(b), which include:  facts may be taken as established (CR 37(b)(2)(A)); a party may be barred from designated claims or defenses, or from introducing designated evidence (CR 37(b)(2)(B)); or an order to strike pleadings, stay proceedings, dismiss the action, or render a judgment by default (CR 37(b)(2)(C)).

P.3d 597 (2013). "[D]iscretionary determinations should not be disturbed on appeal except on a clear showing of abuse of discretion." *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997) (quoting *Associated Mort. Inv'rs v. G.P. Kent Constr. Co.*, 15 Wn. App. 223, 229, 548 P.2d 558 (1976)). An abuse of discretion requires a determination that the trial court's decision was manifestly unreasonable or based on untenable grounds or untenable reasons. *Cook v. Tarbert Logging, Inc.*, 190 Wn. App. 448, 461, 360 P.3d 855 (2015). A court's decision is manifestly unreasonable if, given the facts and the applicable legal standard, it is outside the range of acceptable choices. *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). "A decision is based on untenable grounds if the record does not support the trial court's factual findings." (quoting *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 26 Wn. App. 2d 319, 330, 527 P.3d 134 (2023)). The court reviews the trial court's findings of fact for substantial evidence. *J.K. by Wolf v. Bellevue Sch. Dist. No. 405*, 20 Wn. App. 2d 291, 302-03, 500 P.3d 138 (2021). Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person that the premise is true. *Id*. at 303.

The abuse of discretion standard also applies to the trial court's determination of the nature, extent, and amount of discovery sanctions. It "recognizes that deference is owed to the judicial actor who is 'better positioned than another to decide the issue in question.'" *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993), (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 403, 110 S. Ct. 2447, 2459, 110

L. Ed. 359 (1990)). Further, the rules are "designed to confer wide latitude and discretion upon the trial judge to determine what sanctions are proper in a given case and to reduce the reluctance of courts to impose sanctions. If a review de novo was the proper standard of review, it could thwart these purposes; it could also have a chilling effect on the trial court's willingness to impose . . . sanctions." *Id.* (quoting *Cooper v. Viking Ventures*, 53 Wn. App. 739, 742-43, 770 P.2d 659 (1989)).

**B**

The trial court awarded discovery sanctions in favor of Plaintiffs (as well as Vertical World) based on C3's and Sinars' failure to (a) seasonably supplement a prior response regarding C3's insurance coverage and (b) disclose the visits Sinars attorney, Chris Furman, made to Vertical World gyms. Contrary to C3's and Sinars' arguments, the record supports both grounds for awarding sanctions.

**1**

The following interrogatories and requests for production sought information and documents regarding C3's insurance in effect at the time of Vandivere's accident:

> INTERROGATORY NO. 3: List all insurance policies including, but not limited to, liability, homeowners, automobile, or business policies providing coverage to YOU that were in effect at the time of the INCIDENT.

> INTERROGATORY NO. 4: List all excess or umbrella insurance policies of any kind providing coverage to YOU that were in effect at the time of the INCIDENT.

> . . . .

REQUEST FOR PRODUCTION NO. 1: Please produce a certified copy of any policy of insurance including, but not limited to, liability, homeowners, automobile or business, which was in effect at the time of the INCIDENT through which YOU were or might be covered for the injuries and damages alleged by Plaintiffs.

REQUEST FOR PRODUCTION NO. 2: Please produce certified copies of any and all excess/umbrella insurance policies that were in effect at the time of the INCIDENT through which YOU were or might be covered for the injuries and damages alleged by plaintiffs.

REQUEST FOR PRODUCTION NO. 3: Please produce a certified copy of the declarations page of any policy of insurance that was in effect at the time of the INCIDENT through which YOU were or might be covered for the injuries and damages alleged by Plaintiffs.

REQUEST FOR PRODUCTION NO. 4: Please produce a certified copy of the declarations page of any excess/umbrella insurance policies that were in effect at the time of the INCIDENT through which YOU were or might be covered for the injuries and damages alleged by Plaintiffs.

. . . .

REQUEST FOR PRODUCTION NO. 31: Please produce true and correct copies of all DOCUMENTS identified in YOUR responses to plaintiff's Interrogatories.

C3's response indicated it was covered under a $4M umbrella policy issued by C3's excess insurance carrier, HCC, which was correct when C3 initially responded to these discovery requests in May 2021.

After Sinars withdrew from representing C3 in May 2023, new counsel supplemented the responses related to the umbrella policy within three days of filing their notice of appearance. The supplemented responses indicated that HCC had rescinded the policy approximately four months earlier (on January 26, 2023). Consequently, the excess insurance policy that had represented the vast majority

of C3's total $5M of coverage was no longer available and C3's remaining coverage totaled only $1M. Plaintiffs later discovered that HCC had warned C3 in October 2022 that it was considering rescinding the umbrella policy based on alleged fraudulent information provided by C3's president about the auto-belay's safety and recall history. Plaintiffs also learned C3 responded to HCC in November 2022 about the issue.

As noted previously, CR 26(e)(2) requires a party to supplement a prior discovery request where "the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." Here, C3's initial responses were no longer correct once HCC rescinded its policy in January 2023, and C3's failure to amend its response for nearly four months was in substance a knowing concealment. C3 was aware of the material change to its insurance coverage when HCC rescinded it in January 2023 and was responsible for seasonably supplementing its response. As the trial court noted, Plaintiffs necessarily incurred substantial fees and costs in preparing for a trial that could have been avoided had the HCC rescission letter been produced upon receipt by C3 and its attorneys. The trial court also found, as the above discussion confirms, that the information withheld by C3 was responsive to Plaintiffs' interrogatories and that Sinars and C3 could not in good faith claim the requested documents were not responsive to Plaintiffs' document requests.

Addressing the *timing* of supplemental responses, C3 and Sinars also claim that the trial court abused its discretion in determining they were required to

provide supplemental answers within "a week" after HCC's notice of rescission. CR 26(e)(2)(B) specifies that "[a] party is under a duty *seasonably* to amend a prior response if the party obtains information upon the basis of which the party knows that the response . . . is no longer true . . . ." (Emphasis added). Washington cases do not define or explain the meaning of the term "seasonably." Quoting *Black's Law Dictionary* 1624 (12th ed. 2024), Sinars argues "seasonably" means "within a reasonable time." Accepting that definition, there was no abuse of discretion here given the manifest importance of the information at issue (as the trial court noted) and evidence that HCC first indicated several months earlier (in October 2022) that the policy might be rescinded. On this record, the trial court did not abuse its discretion in awarding sanctions based on Sinars' and C3's dilatory discovery responses.

**2**

Plaintiffs also propounded an interrogatory that required C3 to disclose all dates and locations in which C3's attorneys met with any of Vertical World's employees:

> INTERROGATORY NO. 7: Please identify all dates and locations in which *employees*, agents, attorneys, directors, and officers of Vertical World met with employees, agents, *attorneys*, directors, and officers of C3.

(Emphasis added.) C3 responded on August 25, 2022:

> In January of 2020, Vertical World's Richard Johnston asked to tour C3's facility, and C3 obliged. In April of 2022, representatives from C3, Vertical World, and Plaintiffs all met at Vertical World Seattle to test two Perfect Descent Auto Belays. *C3 does not recall meeting with Vertical World on any other occasion*.

(Emphasis added.)  Despite knowledge that Furman had visited Vertical World alone after an X-ray inspection of the auto-belay device on April 1, 2022, Sinars did not disclose that meeting in its response in August of 2022.  Consequently, C3's response to Plaintiffs' interrogatory was incorrect when made.

As noted previously, additional visits occurred between February and May of 2023 when Furman visited Vertical World over 30 additional times.  When Furman began going regularly, he spoke with Sinars partner Jim Hicks, who "volunteered that he agreed there was no issue with it."  In late April, a few weeks before trial, Furman told Vertical World attorney John Barry (his former law school roommate) that he had been visiting Vertical World and wanted to mention it to Vertical World because he "felt like people were watching [him]" and giving him "side-eye" while he was there, as if they were concerned about his presence. Vertical World notified all parties of the new information on May 8, 2023.  Sinars did not at any point supplement the discovery responses, which omitted this information.

The trial court made detailed findings regarding the timing and significance of Furman's visits to Vertical World.  The court found "Furman had tested the use of C3's auto-belays in Vertical World, an issue which sits at the center of the product defect causes of action."  Furman's first visit to a Vertical World location was "the same exact day as the X-ray inspection of the subject auto-belay, and three days prior to the CR 34 inspection held at the Vertical World gym involving all counsel present."  On this record, the trial court correctly found the "answer to Interrogatory No. 7 was not truthful as it did not mention Christopher Furman's visit

to Vertical World on April 1, 2022, nor did C3 ever supplement their answer to this interrogatory during Mr. Furman's approximately 38 additional visits to Vertical World."

The court also found that both Plaintiffs and Vertical World "were deprived of their ability to further investigate the nature and extent of Mr. Furman's conduct or determine which Vertical World employees, who are witnesses in the case, he may have engaged with [regarding] orientations, supervision, trainings, or other potential interactions that could create its trial advantage." The record supports that finding as well. Thus, in addition to awarding sanctions based on C3's failure to supplement its interrogatory responses and produce responsive documents regarding insurance coverage, the trial court correctly found that C3 failed to properly answer plaintiffs' interrogatory as related to these meetings between C3's attorneys and Vertical World and likewise failed to seasonably supplement its responses regarding these meetings.

**3**

Turning to the amount of the trial court's sanctions award, Sinars (but not C3) asserts a single argument: that the dates selected to determine the amount of the award are erroneous. Contrary to Sinars' argument, the record supports the trial court's methodology.

The trial court explained its reasons and methodology for determining the amount of monetary sanctions awarded to Plaintiffs as follows:

> Separate and apart from the remedies needed to address the prejudice dealt to Plaintiffs which impaired their ability to prepare for the upcoming trial with C3, the Court also finds that sanctions are

needed to address the needless and avoidable costs and fees incurred by Plaintiffs and Vertical World, Inc. in preparing a trial against each other.

The trial court held that such attorney fees and costs should commence on January 26, 2023, the day C3 received the umbrella policy rescission letter from HCC, and continue to the "present day" of the sanctions hearing on June 14, 2023. The court also explained that it chose the January 26 start date because it was "very clear" to the court that "Sinars firm [and C3, having received the letter at issue,] knew of this rescission on January 26, 2023."

Sinars claims the trial court abused its discretion in determining the amount of the sanctions award because there is no evidence that Plaintiffs and Vertical World would have settled as early as January 26. Sinars' argument construes the trial court's reasoning too narrowly. While the trial court was attempting to determine the attorney fees and litigation costs that Plaintiffs would have avoided if the matter had settled earlier, its award also encompassed "the prejudice dealt to Plaintiffs which impaired their ability to prepare for the upcoming trial with C3." Quoting *Magaña v. Hyundai Motor America*, 167 Wn.2d 570, 584, 220 P.3d 191 (2009), the trial court also recognized the four purposes of discovery sanctions, which "are to deter, to punish, to compensate, and to educate." Given the multiple purposes of sanctions awards, the dates selected by the trial court are not manifestly unreasonable. Indeed, Plaintiffs (and Vertical World) could argue persuasively that the time period should begin earlier (when HCC first threatened to rescind the policy) and continue later (as Plaintiffs continued to litigate the

sanctions issue after the June 14 hearing). Sinars' argument that the dates chosen are based on untenable grounds or untenable reasons is unpersuasive.

**C**

Both C3 and Sinars also appeal the trial court's sanctions awarded to Vertical World. They make two arguments: (1) Vertical World lacks standing to seek a discovery sanction because it did not propound the discovery requests at issue; and (2) the amount awarded to Vertical World is unreasonable. Neither argument is persuasive.

**1**

The trial court's ruling, awarding discovery sanctions in favor of Vertical World as well as Plaintiffs, is consistent with the plain language of both CR 26(g) and CR 37(d) and the purpose of modern discovery. CR 26(g) authorizes trial courts to order an attorney or party who certifies a discovery response in violation of the civil rules "to pay the amount of the reasonable expenses incurred *because of the violation*." (Emphasis added). CR 37(d) similarly states, "In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising the party *or both* to pay the reasonable expense, including attorney fees, *caused by the failure*." (Emphasis added.) Where, as here, the discovery violation at issue causes harm to both the party that propounded the discovery requests (in this case Plaintiffs) and another party that reasonably relies on the veracity of the discovery responses (in this case Vertical World), the plain language of these rules permits a trial court to award sanctions that include the reasonable expenses, including attorney fees, incurred by both parties. Critically, C3 and Sinars do not

cite any case law holding that sanctions cannot properly be awarded to a party, like Vertical World, that is harmed by deficient responses to discovery requests propounded by another party. *See State v. Loos*, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020) ("When a party provides no citation to support an argument, this court will assume that counsel, after diligent search, has found none.").

The trial court's ruling also is consistent with the purpose of discovery, which is "to provide a mechanism for making relevant information available to the litigants." *Fisons*, 122 Wn.2d at 341. The "spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues by . . . evasive responses. All of this results in excessively costly and time-consuming activities." *Id.* A "spirit of cooperation and forthrightness during the discovery process is necessary for the proper functioning of modern trials." *Id*. at 342. The aim of the liberal discovery rules is to "make a trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *Gammon v. Clark Equip. Co.*, 38 Wn. App. 274, 280, 686 P.2d 1102 (1984) (quoting *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682, 78 S. Ct. 983, 986, 2 L. Ed. 2d 1077 (1958)). With modern discovery rules, civil trials "no longer need be carried on in the dark. The way is now clear . . . for the parties to obtain the fullest possible knowledge of the issues and facts before trial." *Id.* (quoting *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S. Ct. 385, 389, 91 L. Ed. 451 (1947). The legal principles set forth in these cases apply equally to parties who propound discovery requests and those, like Vertical World, who benefit from and rely on the corresponding discovery

responses. That is especially so given the plain language of CR 5(a), which states "every paper relating to discovery required to be served upon a party . . . shall be served upon each of the parties," thus ensuring that discovery requests and responses are shared with nonpropounding parties.

The trial court's ruling is also factually tenable. Like Plaintiffs, Vertical World presented evidence that it was harmed by the incomplete responses. Vertical World relied on information about C3's insurance coverage as part of its litigation and settlement strategy. The insurance coverage of its codefendant was crucial to Vertical World because, before it learned the $4M excess insurance policy in effect at the time of Vandivere's injury had been rescinded, it had "spirited and forthright discussions about whether, in light of the amount of coverage available to C3, Vertical World's full limits were realistically exposed. [Counsel for Vertical World and Plaintiffs] could not come to an agreement on settlement and hence continued actively litigating." Vertical World relied to its detriment on C3's representation that it had a total of $5M of coverage, stating, "[o]ur assessment of the potential exposure to our client in a joint and several liability situation changed dramatically when we recently received C3's supplemental discovery responses containing HCC's rescission of its excess policy." Both legally and factually, the trial court did not abuse its discretion, nor did it err, in awarding discovery sanctions in Vertical World's favor.

**2**

Turning to the amount of the sanctions awarded to Vertical World, C3 and Sinars argue that the trial court abused its discretion in calculating the sanctions

award, using the lodestar method, based on "reasonable" hourly rates instead of the amount actually charged to Vertical World. We disagree.

The lodestar method multiplies the hours reasonably expended in litigation by the reasonable hourly rate of compensation. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983). In determining a reasonable hourly rate, the court considers factors such as "the [attorney's] usual billing rate, . . . the level of skill required by the litigation, time limitations imposed on the litigation, the amount of the potential recovery, the attorney's reputation, and the undesirability of the case." *Id*. This court reviews the hourly rate used to determine the amount of a lodestar award for abuse of discretion. *Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 148, 859 P.2d 1210 (1993). More generally, "Whether or not a fee is reasonable is an independent determination to be made by the awarding court" based on "circumstances of each individual case." *Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 79 Wn. App. 841, 847, 917 P.2d 1086 (1995). Appellate courts must be "mindful that it is the trial judge who watches a case unfold and who is in the best position to determine the proper lodestar amount." *Morgan v. Kingen*, 141 Wn. App. 143, 163, 169 P.3d 487 (2007).

Sinars and C3 claim the hourly rates were unreasonable simply because they exceeded the "panel" rates that Vertical World's counsel charged to Vertical World's insurer as part of their agreement to defend Vertical World. But our Supreme Court has squarely held that, in applying the lodestar method, "The attorney's usual fee is not . . . conclusively a reasonable fee and other factors may necessitate an adjustment." *Bowers*, 100 Wash.2d at 597. The adjustment factors

include: "the difficulty of the questions involved, the skill required, customary charges of other attorneys, the amount involved, the benefit resulting to the client, the contingency or certainty in collecting the fee and the character of the employment." *Fetzer*, 122 Wn.2d at 150. Notably, the factors do not include a consideration of what the attorney *actually* charged the client. Instead, the reasonable hourly rate is "grounded specifically in the market value of the property in question—the lawyer's services." *Id*. Moreover, as noted previously, the function of a sanctions award is not solely to reimburse but "to deter, to punish, to compensate, and to educate." *Magaña*, 167 Wn.2d at 584.

The trial court did not abuse its discretion in determining reasonable hourly rates for Vertical World's attorneys. Vertical World's motion for attorney fees was supported by declarations from counsel as to the basis for their rates. After scrutinizing these filings, the trial court determined that the hourly rates requested by Vertical World were reasonable. The record amply supports the trial court's lodestar analysis. Given the multitude of relevant factors and the applicable standard of review, the trial court did not abuse its discretion when it used reasonable rather than actual rates to determine the sanctions amount awarded to Vertical World.

Nor does *In re Disciplinary Proceeding Against Dynan*, 152 Wn.2d 601, 98 P.3d 444 (2004), cited by Sinars, require the court to utilize actual rates. In *Dynan*, attorney disciplinary proceedings were initiated based on the attorney's false submissions to the court of bills for legal services that had been altered in order to obtain an award of attorney fees for a higher amount. The case turned on the

- 19 -

issues associated with submitting false information to the tribunal, which did not occur here. Vertical World's attorneys provided the trial court with a detailed and accurate breakdown of the work performed during the relevant time period. Accordingly, *Dynan's* holding regarding the use of actual fees charged does not control the lodestar analysis here.

**D**

We next address whether the trial court abused its discretion (or erred) in ruling that C3 and Sinars should be jointly and severally responsible for the sanctions awards. Both the plain language of the civil rules and applicable case law indicate that sanctions may be imposed jointly and severally. CR 26(g) states that sanctions may be imposed "upon the person who made the certification, the party on whose behalf the request, response, or objection is made, *or both*." (Emphasis added). CR 37(d) also authorizes trial courts to award reasonable expenses, including attorney fees, against "the party failing to act or the attorney advising the party, *or both*." (Emphasis added.) Consistent with the plain language of these rules, the court squarely held in *Wixom v. Wixom*, 190 Wn. App. 719, 360 P.3d 960 (2015), that "Courts may order parties and their attorneys to be jointly and severally liable for attorney fees." *Id.* at 728; *see also Orwick v. Fox*, 65 Wn. App. 71, 92, 828 P.2d 12 (1992) ("The liability of appellants' attorney for this appeal shall be joint and several."). Our Supreme Court similarly recognized in *Fisons* that trial courts have "discretion to fashion 'appropriate' sanctions" and, citing CR 26(g), confirmed that "sanctions may be imposed upon the signing attorney, the party on whose behalf the response is made, *or both*." 122 Wn.2d at 355

(emphasis added). And lastly, a principal can be held liable for the actions of its agents. *Kosovan v. Omni Ins. Co.*, 19 Wn. App. 2d 668, 687, 496 P.3d 347 (2021).

Ample evidence supports the trial court's ruling. The court thoroughly explained its ruling, noting that on January 26, 2023, HCC informed C3's President, Ron Naranjo, and C3's in house counsel, James Moss, that the umbrella policy was rescinded. Moss testified at his deposition that he told Sinars about HCC's decision to rescind the policy and that he forwarded relevant documents to Sinars. Summarizing this evidence at the June 14 sanctions hearing, the trial court stated:

> I want to be clear here that because it is very clear to this Court that the Sinars firm knew of this rescission on January 26, 2023 – again I reference that by the declaration that I received yesterday from Mr. Foss [sic] – based on that, their lability [sic] for these costs and fees of Plaintiffs' shall be joint and several between C3 and the Sinars law firm.

Thus, the record supports the trial court's finding that both C3 and Sinars violated the applicable discovery rules.

C3 relies on two cases in support of its argument that parties should not be held liable for the actions of their counsel. First, it cites *In re Matter of Firestorm 1991*, 129 Wn.2d 130, 145, 916 P.2d 411 (1996), where the court remanded the matter because the record did not contain sufficient detail to support the award of sanctions and the trial court did not enter findings of fact. No such situation exists here. Second, C3 relies on *Carroll v. Akebono Brake Corp.*, 22 Wn. App. 2d 845, 900, 514 P.3d 720 (2022), which reversed sanctions against a plaintiff because "*none* of the conduct that Carroll *herself* engaged in met all of the factors that are

- 21 -

required to be satisfied under *Burnet* in order for a trial court to impose severe discovery sanctions." *Id*. Here, in contrast, the trial court did not award one of the "harsher remedies" that requires a *Burnet* analysis. And even if *Burnet* applied here, the trial court considered the *Burnet* factors, finding both willfulness and prejudice and considering on the record the imposition of less severe sanctions. C3's reliance on *Firestorm* and *Carroll* is therefore misplaced.

Sinars, for its part, attempts to distance itself from any knowledge of C3's wrongdoing, but its citations to the record purporting to show how little it knew about C3's conduct instead demonstrate the opposite. For example, when HCC first notified C3 that it was investigating possible rescission of the umbrella policy in October 2022, Moss had a 45-minute phone call with Sinars about the investigation. Weeks later, in his response to HCC about the investigation, Moss wrote, "[a]n insurance company under Colorado law has no privilege with its policyholders. As such, any documentation provided would be available to the plaintiff in this case. If you wish to access documents, please contact defense counsel Scott Wood of Sinars Slowikowski Tomaska." Notably, Scott Wood of Sinars was courtesy copied on the letter. These facts, too, show that the trial court did not abuse its discretion (nor did it err) in ruling that C3 and Sinars are jointly responsible for the sanctions awards.[4]

---

[4] Along with its reply brief, Sinars filed a RAP 9.11 motion to take additional evidence on appeal, attaching what it claims is unassailable proof that C3 alone is responsible for the insurance-related discovery violations. We deny the motion because, among other reasons, the proffered evidence does not change our decision regarding joint and several responsibility for the trial court's sanctions award, as set forth in the text above. RAP 9.11(a)(2); *Eugster v. City of Spokane*, 118 Wn. App. 383, 413, 76 P.3d 741 (2003).

III

At the hearing on Plaintiffs' sanctions motion, the trial court commented, "My view [is] that the conduct here in this case did violate RPC 4.2 and 4.3"[5] and directed Plaintiffs' counsel to "refer [the] matter to [(WSBA)] and to indicate that I directed them to do this" because "I think these facts are, frankly, sufficient to do that." Sinars argues the trial court "erred as a matter of law in finding violations of RPCs 4.2 and 4.3." We disagree that the trial court made any such "finding" and affirm the trial court's reference order.

Preliminarily, this court's authority is limited in this context. "The regulation of the practice of law in Washington is within the inherent power of the Supreme Court." *Chism v. Tri-State Constr., Inc.*, 193 Wn. App. 818, 838, 374 P.3d 193 (2016) (quoting *Graham v. State Bar Ass'n*, 86 Wn.2d 624, 631, 548 P.2d 310 (1976)) (cleaned up). Pursuant to its plenary power to regulate the practice of law, the Supreme Court adopted the RPCs "to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." *Id.* at 839 (quoting RPC Scope cmt. 20). "Failure to comply with an obligation or prohibition imposed by a Rule is a basis for invoking the disciplinary process." RPC Scope cmt. 19. The disciplinary process is a "formal, public process" governed by

---

[5] RPC 4.2 provides, "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter" without the consent of the other lawyer or authorization by law or a court order. Additionally, RPC 4.3 provides, "In dealing on behalf of a client with a person who is not represented by a lawyer, a lawyer shall not state or imply that the lawyer is disinterested." The rule continues, "When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding." *Id.*

the Rules for Enforcement of Lawyer Conduct (ELCs) in which a lawyer may be sanctioned by the disciplinary authority "[u]pon a finding that a lawyer has committed an act of misconduct" in violation of the RPCs. *Chism*, 193 Wn. App. at 839 (quoting ELC 13.1).

Conversely, the RPCs "are not designed to be a basis for civil liability." *Id.* (quoting RPC Scope cmt. 20). To this end, our Supreme Court has expressly held that "breach of an ethics rule provides only a public, *e.g.*, disciplinary, remedy and not a private remedy." *Hizey v. Carpenter*, 119 Wn.2d 251, 259, 830 P.2d 646 (1992). Examples of public remedies include rendering a contract unenforceable as violative of public policy and disgorgement of attorney fees. *See Chism*, 193 Wn. App. at 840-41 (citing in part *LK Operating, LLC v. Collection Grp., LLC*, 181 Wn.2d 48, 85, 331 P.3d 1147 (2014), and *Eriks v. Denver*, 118 Wn.2d 451, 462, 824 P.2d 1207 (1992)). In contrast, Washington courts have recognized that "[t]he RPCs cannot be proper grounds for the trial court to base a fee award." *Just Dirt, Inc. v. Knight Excavating, Inc.*, 138 Wn. App. 409, 417, 157 P.3d 431 (2007).

Consistent with this sharp distinction between disciplinary matters and civil litigation, the trial court did not base its sanctions award on a "finding" that a Sinars lawyer violated an RPC. Instead, as discussed above, the court imposed sanctions under the civil rules based on Sinars' discovery violations. Nowhere in the court's detailed, 39-page order does it discuss whether Sinars' lawyers violated RPC 4.2 or 4.3 or whether such violations serve as a basis for imposing or calculating the amount of discovery sanctions. Indeed, Plaintiffs expressly disavowed reliance on the RPCs as a basis for their sanctions request, clarifying,

"Plaintiffs bring a motion for sanctions for discovery misconduct, not an ethics complaint before [WSBA]. This proceeding is not one which requires a determination of compliance with the RPCs but with the rules of discovery."

Although a trial court can, in certain contexts, properly determine that a lawyer has violated an RPC (*see, e.g., Behnke v. Ahrens*, 172 Wn. App. 281, 297-98, 294 P.3d 729 (2012) (trial court properly determined lawyer violated RPC 1.7(b) and ordered disgorgement of fees in clients' action for breach of fiduciary duty and malpractice)), the trial court here did not make any formal finding to that effect. Rather, viewing the entire colloquy regarding the RPCs, we conclude the trial court was merely explaining why it believed there were sufficient facts to justify referring the lawyers to WSBA for suspected violations of RPC 4.2 and 4.3. Additionally, the fact that the trial court omitted any reference to the RPCs in its written order shows that its "view" as to whether Furman, Lemmon, and Hicks violated RPC 4.2 or 4.3 was not material to its conclusion that Sinars should be sanctioned under CR 26(g) or CR 37(d). *See Heckard v. Murray*, 5 Wn. App. 2d 586, 596-97, 428 P.3d 141 (2018) (affirming award of CR 11 sanctions where trial court "did not frame the issue as whether [the sanctioned party's] statements were proper" under RPC 3.6 but rather whether "documents [were] properly filed before this court"). In short, whether Furman, Lemmon, and Hicks violated RPC 4.2 or 4.3 is irrelevant to resolving the issues raised in this case and must, instead, be determined by the appropriate disciplinary authority in accordance with the disciplinary process outlined above.

Lastly, Sinars' contention that the trial court "committed further error by referring [Furman, Lemmon, and Hicks] to the WSBA for" suspected violations of RPCs 4.2 and 4.3 is without merit. Sinars cites no legal authority for the proposition that a judge cannot direct a lawyer to refer another lawyer to WSBA if the judge believes the lawyer has violated the RPCs. To the contrary, the Code of Judicial Conduct (CJC) expressly encourages such reporting. *See* CJC 2.15(B) ("A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question regarding the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects should inform the appropriate authority."); CJC 2.15(D) ("A judge who receives credible information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct should take appropriate action."). We affirm the trial court's reference order.

## IV

Plaintiffs and Vertical World argue they are entitled to recover attorney fees on appeal. We agree.

This court's opinion in *Andren v. Dake*, 14 Wn. App. 2d 296, 472 P.3d 1013 (2020), is on point. The court there held:

> To avoid incentivizing sanctioned parties from appealing in order to exhaust the benefit of any sanctions award granted by the trial court to their aggrieved opponent, we hold that Dake must compensate Andren for all of the costs of successfully remedying the harm resulting from the misconduct of his counsel at trial, including the cost of attorney fees incurred while defending the new trial order on appeal.

*Id.* at 322. Here too, to avoid incentivizing C3 and Sinars from appealing to exhaust the benefit of the sanctions award to Plaintiffs and Vertical World, we hold that C3 and Sinars must compensate Plaintiffs and Vertical World for the costs of successfully remedying the harm resulting from the discovery violations, including the cost of attorney fees incurred while defending the sanctions order on appeal.

Subject to their compliance with RAP 18.1, we grant Plaintiffs' and Vertical World's requests for fees on appeal.

Affirmed.

_Feldman, J._

WE CONCUR:

_Smith, C.J._          _Mann, J._